FILED
John E. Triplett, Acting Clerk
United States District Court

By MGarcia at 12:27 pm, Sep 02, 2020

# In the United States District Court for the Southern District of Georgia
# Brunswick Division

| | |
|---|---|
| THURMISHA R. PRICE., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL KANAGO; JOEY HYER; CAMERON ARNOLD; RESDEN TALBERT; and DAVID HANEY, in their individual and official capacities as officers of the Glynn County Police Department; ROBERT BRYCE SASSER, in his capacity as Personal Representative of the Estate of ROBERT CLIFTON (COREY) SASSER; and GLYNN COUNTY, GEORGIA. <br><br> Defendants. | No. 2:19—CV-4 |

## ORDER

Before the Court is a Motion for Summary Judgment, dkt. no. 34, by Defendants Michael Kanago, Joey Hyer, Cameron Arnold, Resden Talbert, and David Haney, in their individual and official capacities as officers of the Glynn County Police Department ("GCPD"), as well as Robert Bryce Sasser, as representative of the Estate of Robert Clifton (Corey) Sasser and Glynn County, Georgia ("Glynn County") (collectively, "Defendants"). The motion has been fully briefed and is ripe for review. For the reasons below, the motion will be **GRANTED**.

## BACKGROUND

On or around January 2017, Defendant Kanago and another officer with the GCPD responded to a reported domestic dispute at a residence (the "Residence") where Plaintiff Thurmisha Price and non-party Gary Campbell lived together. Dkt. No.34-3 ¶¶ 1-2, 5. Campbell was no longer there by the time the officers arrived. Id. ¶ 3. Kanago advised Price that Campbell was a "fugitive" with an outstanding arrest warrant and that she should call the police if Campbell returned. Id. ¶¶ 6-7. Kanago also told Price that she could be arrested if she harbored Campbell. Id. ¶ 8. The following day, Campbell returned to the house. Id. ¶ 9. As instructed, Price called the police; however, Campbell left the house before the police arrived. Id. ¶¶ 9-10. The police reiterated to Price that she should call them if Campbell returned. Id. ¶ 11.

On the night of January 4, 2017, Defendants Kanago, Arnold, and Hyer returned to the Residence. Id. ¶¶ 12-13. As they approached, Campbell opened the front door and began to step outside. Id. ¶ 14. According to Defendants, Arnold ordered Campbell to stop, but Campbell went back into the Residence and shut the door. See id. ¶ 15. Arnold kicked in the front door and chased Campbell into the house. Id. Meanwhile, Kanago and Hyer went to the back of the Residence to cut off Campbell in the event he fled through the back door. See id. Arnold arrested Campbell inside the Residence. Id.

Body camera footage depicts some of the events that took place immediately after Campbell's arrest. Specifically, Kanago's body camera shows Kanago running from the back of the Residence toward the front door where he enters into the living room and finds Arnold handcuffing Campbell on the floor. Dkt. No. 34, Body Camera 1 at 0:12-28. During this time, Price was sitting on a couch near the front door. She was partially unclothed and covering herself with a blanket. See id. at 0:37. Though most of the living room lights were off, the television was turned on and the volume was loud. Id.

After Campbell had been escorted from the Residence, Kanago and other officers confronted Price about having failed to notify them that Campbell had returned. Dkt. No. 34, Body Camera 2 at 1:39-1:52. Price told the officers that she had been asleep and that Campbell had "just walked in" before the police came through the door. Id. at 1:52-1:54. The officers then began to press Price for more details. Id. at 2:11-2:18. Price explained that Campbell had come into the Residence "from the back" and that she had been sleeping on the couch before she was woken by officers kicking in the door. Id. at 2:16-2:30. She stated that when Campbell originally opened the door, he shouted an expletive. Id. at 4:00-4:03. Price said that at that time she saw a light outside and asked Campbell what it was. Id. at 4:00-403, 4:16-4:21. She said that Campbell then closed the door, and shortly thereafter the

3

officers burst into the Residence. Id. at 4:04-4:06. After the discussion concluded, Kanago handcuffed Price, and she was escorted to a patrol car. Id. at 6:45-10:36.

In her deposition, Price testified that although she and Campbell lived together at the Residence, only Campbell's name was on the Residence's lease agreement. Dkt. No. 35-1 at 7. She further testified that on the day in question she had spoken with Campbell on the phone but had not seen him, nor was she aware that he planned to return to the Residence. See id. at 12. She stated that she had woken up to the sound of police coming into the Residence and saw Campbell for the first time after waking. Id. She indicated that she did not know Campbell had been there while she was sleeping, nor did she know how long he had been back. Id. at 13.

In his deposition, Kanago testified that he did not have any knowledge of Price having failed to report Campbell prior to the January 4 incident. Dkt. No. 35-3 at 5. He also testified that when he entered the Residence on the night in question, Price was on the couch, slightly undressed, and "appeared to be alert." Id. He recalled the living room "being low lit" with "a lot of ambient light," and though he did recall the television being on, he admitted that the scene was not inconsistent with someone who had fallen asleep watching television. Id. at 5-6. He conceded that there was nothing in the Residence to indicate that Campbell was

4

probably not asleep. Id. at 5. When asked what evidence he had that Campbell was untruthful about having been asleep, he stated:

> Well, for a lot of things, we get people that are untruthful in general in possible domestic situations. One . . . we hear a lot is, I don't know; I was asleep. So that is where we had the evidence that she was in the house at that time. He was in the residence and that's what we went off of.

Id. at 5-6. He later stated, "[j]ust the fact that she was in there while he was in there at the same time, was our rationale for making that arrest." Id. at 6. He did not recall if he conferred with other officers before making the arrest. Id.

Hyer testified that when he entered the Residence on the night in question, Price was on the couch wearing "loose-fitting clothing." Dkt. No. 35-4 at 4, 6. He indicated that aside from the television there were no lights on in the living room. Id. at 6. He did not have any knowledge about whether Price was awake before the police entered the Residence. Id. When asked about the specific facts he believed established probable cause to arrest Price, he stated, "[t]he fact that Mr. Campbell was at the scene, Mr. Campbell was in the same residence of Ms. Price." Id. at 7. He noted, however, that "[t]he charge was made by another officer who believed that he had the probable cause to make that charge" and he "wasn't in a position to disprove [sic] or approve." Id. at 6-7.

5

Finally, Arnold testified that when he went through the front door of the Residence on the night in question, he saw Campbell going toward the kitchen in the back. Dkt. No. 35-6 at 6. Though he saw "a couple of people" in his periphery, he did not recall who they were. Id. He did note, however, that "everybody was awake." Id.

At some point after Price was put under arrest, a Glynn County Magistrate Judge issued a criminal arrest warrant charging Price with hindering apprehension of a criminal in violation of O.C.G.A. § 16-10-50. Dkt. No. 34-3 ¶ 29. Defendants appended to their motion the affidavit in support of the warrant, signed by an officer David Haney.[1] In pertinent part, the affidavit stated that Price:

> [U]nlawfully and without authority knowingly and with the intention to hinder the apprehension of Gary Campbell, a person he or she knew or should have had reasonable grounds to believe was charged with the offense, To Wit: Accused committed offense after being advised that Gary Campbell had an outstanding felony warrant (Felony Probation Violation) and he was located inside of her residence . . . a felony in the State of Georgia, did then and there harbor said person of the crime, Felony Probation violation to which he or she is charged, and this deponent makes this affidavit that a warrant may issue for his (her) arrest.

Dkt. No. 35-7.

The hindering apprehension charge against Price proceeded to trial, and the state court granted a directed verdict in her favor.

---

[1] Defendants have represented—and Price has conceded—that the David Haney named in the caption and served with this suit is not the same David Haney that applied for Price's warrant. Dkt. No. 34-1 at 8.

6

Dkt. No. 34-3 ¶ 30. Thereafter, Price filed the present action in this Court asserting causes of action against Defendants under 42 U.S.C. § 1983 for false arrest (Count I), false imprisonment (Count II), malicious arrest (Count III), malicious prosecution (Count IV), and violations of the Fourth (Count V) and Fourteenth (Count VI) Amendments to the United States Constitution. Dkt. No. 1. Now before the Court is Defendants' Motion for Summary Judgment in which they contend that Plaintiff's claims must fail as a matter of law. For the reasons discussed below, Defendants' motion is **GRANTED**.

## LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Investor Group.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. Factual disputes that are "irrelevant or unnecessary" are not sufficient to survive summary judgment. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp

7

v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan J. dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

### A. Culpability of Defendants Talbert, Haney, and Sasser

As an initial matter, Defendants point out that Resden Talbert, David Haney, and Corey Sasser played no role in Price's arrest and therefore have no liability in this matter. Dkt. No. 34-1 at 8. Price expressly concedes this point in her opposition brief. Dkt. No. 39-1 at 9. Accordingly, the Court will **GRANT** Defendants' Motion with respect to these Defendants and **DISMISS** Talbert, Haney, and Sasser from this action.

### B. Probable Cause

Most of Defendants' remaining arguments are based on the contention that Defendants had probable cause to arrest and detain Price for the charged crime on the night in question. Undoubtedly, if Defendants could establish that there was probable cause for the arrest, each of Plaintiff's claims would necessarily fail as matter of law. See Abercrombie v. Beam, 728 Fed. App'x 918, 922 (11th Cir. 2018) ("[T]he existence of probable cause is an absolute bar to a § 1983 false-arrest claim."); Black v. Wigington, 811 F.3d 1259, 1267 (11th Cir. 2016) ("[T]he presence of probable cause defeats a claim of malicious prosecution."); Case v. Eslinger, 555 F.3d 1317, 1330 (11th Cir. 2009) ("Our precedents establish that a claim of false imprisonment, absent misidentification, depends on absence of probable cause."); Carter v. Reynolds, No. C79-487A, 1980 U.S. Dist. LEXIS 13366, at *2 (N.D. Ga. 1980) ("[T]he

9

existence of probable cause is a defense to charges of malicious arrest."). However, Defendants also argue that Price's claims are barred by the doctrine of qualified immunity because "arguable probable cause" existed to justify Price's seizure. If the Court finds that Defendants had arguable probable cause to arrest Price, the individual Defendants will be protected by the doctrine of qualified immunity.

Qualified immunity grants "complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). To establish a qualified immunity defense, defendants must first show that the allegedly unconstitutional conduct occurred while they were acting within the scope of their discretionary authority. Estate of Cummings v. Davenport, 906 F.3d 934, 940 (11th Cir. 2018). The burden then shifts to the plaintiff, who must show that the defendant's alleged actions violated a constitutional or statutory right and that such a right was "clearly established." Bogle v. McClure, 332 F.3d 1347, 1355 (11th Cir. 2003).

Here, neither party disputes that the individual officers on the night in question were acting within the scope of their discretionary authority. Accordingly, the Court must only address whether Price has satisfied her burden of showing that Defendants

10

violated a clearly established constitutional right. Individuals have a clearly established right not to be seized, detained, and prosecuted for crimes unless there is probable cause. However, to establish probable cause in the qualified immunity context, it need only be shown that Defendants had "arguable," rather than actual, probable cause. Poulakis v. Rogers, 341 Fed. App'x 523, 526 (11th Cir. 2009) ("[T]he officer's conduct may still be insulated under the second prong of qualified immunity if he had 'arguable probable cause' to make the arrest." (emphasis in original)). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the [Defendants] could have believed that probable cause existed to arrest." Gates v. Khokhar, 884 F.3d 1290, 1298 (11th Cir. 2018) (internal quotation omitted).

The state of Georgia's harboring statute provides, in pertinent part,

> A person commits the offense of hindering the apprehension or punishment of a criminal when, with intention to hinder the apprehension or punishment of a person whom he knows or has reasonable grounds to believe has committed a felony or to be an escaped inmate or prisoner, he . . . harbors or conceals such person.

O.C.G.A. § 16-10-50. It is axiomatic that Price could not have formed the intent to hinder the GCPD's apprehension of Campbell if she was sleeping when Campbell returned, see O.C.G.A. § 16-2-2 ("A person shall not be found guilty of a crime committed by misfortune

11

or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence."), nor could she practically be held accountable for failing to call the police, see Kolencik v. Stratford Ins. Co., 195 Fed. App'x 855, 857 (11th Cir. 2006) ("[T]he law cannot require an impossible act.").

However, the Court finds that there was sufficient evidence at the scene for a reasonable officer to conclude Price had not been sleeping when Campbell entered the Residence. Indeed, Kanago's body footage from the night in question shows that when he entered the house, some of the lights were turned on and the television was unmuted and playing at a fairly high volume. Moreover, when officers questioned Price about Campbell's presence in the residence, she offered conflicting statements about when he had entered. Specifically, Price first told officers that she had been asleep and that Campbell had "just walked in" before the police came through the door. Body Camera 2 at 1:52-1:54. Later, however, she was able to identify details about Campbell's entry that would have been inconsistent with her having been sleeping, such as that Campbell had entered "from the back," id. at 2:11-2:18, and even that she had communicated with Campbell just before the officers entered, see id. at 4:00-4:21 (indicating that Price had said "what's that?" presumably to Campbell, after Campbell had opened the front door). A reasonable officer could have interpreted

12

these inconsistent statements as an indication that Price was trying to hide the fact that Campbell had been present for longer.

Undoubtedly, this probable cause evidence is not unmitigated. There was also evidence from the scene that was consistent with Price's claim that she was sleeping, including that when the police entered, she was on the couch, partially unclothed, with most of the lights turned off. Furthermore, her seemingly inconsistent statements could be explained by the fact that she was still a bit hazy from her slumber and struggling to piece together what had happened after police burst through the front door. However, the arguable probable cause inquiry does not ask the Court to weigh the evidence to determine whether the officer's decision to arrest was valid. Rather, it simply asks the Court to determine whether a reasonable officer, presented with the same set of objective facts, could have determined that there was sufficient probable cause for the arrest. Given both the state of the Residence at the time of the arrest and Campbell's seemingly inconsistent statements, the Court finds that a reasonable officer could have found that Price was awake when Campbell entered with time to alert the police.

This conclusion, however, does not end the matter. Price argues that even if the evidence established that she was awake in the Residence when Campbell entered, this fact is not enough to create arguable probable cause that she violated Georgia's

13

harboring statute. Specifically, Price argues that O.C.G.A. § 16-10-50 does not inculpate one who is merely present with a known fugitive. However, to prevail on this argument, Price must do more than simply persuade the Court that this is the proper interpretation of Georgia's harboring statute; rather, Price must satisfy her burden of showing that, at the time of her arrest, it was "clearly established" that her presence with Campbell on the night in question did not constitute harboring or concealing under O.C.G.A. § 16-10-50. Though perhaps just narrowly, the Court finds that Price has failed to satisfy her burden.

To show that a right was "clearly established" at the time of an arrest, plaintiffs may use three methods: First, they may bring forth a "materially similar case" decided prior to the officer's actions that gives notice to the officer that his actions were unlawful. Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005). Second, they can "show that a broader, clearly established principle should control the novel facts in this situation." Id. (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)). Finally, they can show that the conduct so obviously violates [the] constitution that prior case law is unnecessary. Id. (citing Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002)).

At the outset, neither party has pointed to binding caselaw concerning whether an alleged perpetrator's presence with a known fugitive is sufficient to violate Georgia's harboring statute. Nor

14

has Price made any meritorious argument that her arrest was so obviously unconstitutional that she need not present any caselaw. Accordingly, the Court must consider whether there is some broader principle of law that is clearly established and controls the facts here. To prevail on this theory, however, Plaintiff must not rely on overly generalized principles but rather must point to something "specific enough to give the officers notice of the clearly established right." Id. at 1160.

To support her position here, Price seems to rely on the principle that a crime must contain an *actus reus*, or some form of overt act, in order to be cognizable in Georgia. See Daddario v. State, 307 Ga. 179, 184 (2019) (stating that every crime in Georgia "has as elements an actus reus and a mens rea" (citing O.C.G.A. § 16-2-1(a))); see also Henderson v. Hames, 287 Ga. 534, 538 (2010) ("An indictment is void to the extent that it fails to allege all the essential elements of the crime or crimes charged."). Price argues that, under the Defendants' interpretation of § 16-10-50, suspects could be arrested for simply being present with a fugitive despite having taken no action to "harbor" or "conceal" them. Thus, the reasoning goes that because such a crime would be devoid of an *actus reus*, Price's interpretation that requires some affirmative act to harbor or conceal is clearly established under the law.

Though cogent, this argument does not withstand scrutiny. To be sure, an *actus reus* in Georgia can consist of either "an act *or*

15

*omission to act*" Id. (quoting O.C.G.A. § 16-2-1(a)) (emphasis added). Therefore, evidence suggesting that an individual was present with a known fugitive with sufficient time to contact the police could, in a reasonable officer's view, be sufficient to create probable cause for a violation of Georgia's harboring statute. This is not meant to suggest that § 16-10-50 does, in fact, criminalize a failure to act, nor does the Court find that this is necessarily the best interpretation of that statute.[2] Rather, the Court simply finds that Price's interpretation—that one must take affirmative action to harbor or conceal pursuant to O.C.G.A. § 16-10-50—was not "clearly established" at the time she was arrested. Accordingly, the individual Defendants are protected by the qualified immunity doctrine.

**C. Glynn County Liability**

Next, Defendants argue that Price cannot establish the elements of a § 1983 claim against Defendant Glynn County because she has

---

[2] To the contrary, multiple non-binding sources of authority suggest that affirmative action is required to violate Georgia's harboring statute. See Owen v. State, 202 Ga. App. 833, 833 (1992) (finding that the State was "required to prove that . . . appellants *committed one or more acts* to harbor or conceal [the escapee]"); see also United States v. Annamalai, 939 F.3d 1216, 1233 (11th Cir. 2019) (finding that the harboring or concealing element of the federal harboring statute "requires some affirmative, physical action by the defendant") (quoting United States v. Zabriskie, 415 F.3d 1145 (10th Cir. 2005)); see also 2 Ga. Jury Instructions § 1.43.30 ("A jury is not authorized to find a person who was merely present at the scene of the commission of a crime at the time of its perpetration guilty of consent in and concurrence in the commission of the crime, unless the evidence shows, beyond a reasonable doubt, that such person committed the alleged crime, helped in the actual perpetration of the crime, or participated in the criminal endeavor."). Most notably, however, the Georgia Supreme Court has not approved of the Owen's Court's holding, nor has the Eleventh Circuit or Supreme Court given guidance on whether O.C.G.A. § 16-10-50 requires affirmative action.

16

not offered any evidence of an official policy or custom demonstrating the county's liability. The Court agrees. It is well-settled that a party cannot assert a claim of vicarious liability under § 1983. Cook v. Sheriff of Monroe County, 402 F.3d 1092, 1116 (11th Cir. 2005). Accordingly, to assert a claim against a municipality, the plaintiff must show that "the municipality *itself* cause[d] the constitutional violation at issue." Id. (quoting City of Canton v. Harris, 489 U.S. 378, 395 (1989)). To do this, the plaintiff must demonstrate: "(1) that [her] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." Barr v. Gee, 437 Fed. App'x 865, 874 (11th Cir. 2011) (quoting McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004)).

In an apparent effort to establish such a custom or policy with regard to Glynn County, Price argues:

> In the body cams and the depositions in this case, the police officers threaten Ms. Price over and over that if Ms. Price does not call them when Mr. Campbell shows up, the police will arrest her. This is not the law. This has not been the law for at least forty-one years. Yet it has permeated the Glynn County Police Department to such an extent that the police officers there have began [sic] to believe the fables as truth, arresting people, mostly women, who have not violated the law . . . These customs and fables drive the prosecution of hindering the apprehension or punishment of wanted persons cases.

17

Dkt. No. 39-1. Price does not, however, point to any particular policies or even cite to any particular examples in the record demonstrating that Glynn County condoned the officers' actions. Indeed, "the mere fact that a municipal employee caused an injury does not imply municipal culpability and causation." Barr, 437 Fed. App'x at 876. Because Price has failed to show, beyond her own conclusory allegations, that Glynn County had a custom or policy of unlawfully detaining and prosecuting suspects based on alleged violations of the state harboring statute, this Court finds that Price's claims against Glynn County must be dismissed. Moreover, because a § 1983 suit against an officer in his or her official capacity is "another way of pleading an action against an entity of which an officer is an agent," Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (quotation omitted), the claims against the officers in their official capacity must likewise be dismissed.

## CONCLUSION

For the reasons above, Defendantss Motion for Summary Judgment, dkt. no. 34, is **GRANTED**. The Clerk of Court is **DIRECTED** to **close this case**.

**SO ORDERED**, this 2nd day of September, 2020.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA